**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Robyn Marshall,

                Plaintiff,

    v.

Belmont County Board of Commissioners,
et al.,

                Defendants.

Case No. 2:13-cv-966

Judge Graham

Magistrate Judge King

## <u>OPINION & ORDER</u>

This matter is before the Court on the Defendants' Motion for Summary Judgment (doc. 43). For the reasons that follow, the Court will GRANT the Defendants' Motion.

## I.      Background

The Plaintiff, Robyn Marshall, is the former Director of the Belmont County 911 Center. The Defendants are: the Belmont County Board of Commissioners; the three members of the Board of Commissioners at the time of the Plaintiff's termination, Ginny Favede, Matthew Coffland, and Charles Probst; Christine Palmer, the County's Human Resource director; and Steve Clark, a County employee.

In 2007, the Belmont County 911 Board hired the Plaintiff as the Director. Marshall Dep. at 23, doc. 19-1. The next year, in 2008, the 911 Board became an advisory, rather than governing, board, <u>id.</u> at 28–29, and the Belmont County Board of Commissioners assumed responsibility for the operation of the 911 Center. As Director of the 911 Center, the Plaintiff was a department head for the Board of Commissioners. <u>Id.</u> at 34.

1

In 2011, the Plaintiff's relationship with the 911 Board began to deteriorate. Members of the 911 Board and the County Sheriff frequently criticized the Plaintiff and questioned her ability to effectively operate the 911 Center. Id. at 38–40. During this time period, the Plaintiff was subject to profane language and harassment. For example, prior to a meeting of the 911 Board, the 911 Board president informed the Plaintiff that she was going to be presented with a t-shirt that said "Director Cunt" on it. Id. at 39, 51–53. In another instance, while reviewing the County's inventory of radios and pagers, the Plaintiff found a note on one of the pagers that said "[she] could shove that pager up [her] ass." Id. at 39–40. On another occasion, an assistant chief of a local fire department told the Plaintiff that he was going to come to her office and "physically shove 150 page[rs] up [her] ass." Id. at 40, 59–62, 65.

As a result of this harassment and criticism, the Plaintiff complained to the Board of Commissioners on multiple occasions. Id. at 43. The Plaintiff discussed the t-shirt incident with the County's part-time HR director, Mike Kinter, and explained that she felt she was being discriminated against because she was a woman. Id. at 55. Specifically, the Plaintiff emphasized that she operated the 911 Center in the same manner as her predecessor, Cliff Sligar, and that he had never been subjected to similar treatment. Id. at 55–56.

In October 2011, the Plaintiff then met directly with the Board of Commissioners and reiterated her concerns regarding the "harassment" and "mistreatment" she was subject to as the Director of the 911 Center. Id. at 57. The Plaintiff expressed her belief that she was being mistreated because she was a woman. Id. During the discussion with the Board of Commissioners, the Plaintiff indicated a willingness to transfer departments to avoid further problems with the 911 Board. Id. at 57–58. To prevent further problems between the Plaintiff and the 911 Board, the Board of Commissioners sent a letter to the 911 Board informing its

members that the Plaintiff's participation at the 911 Board's monthly meetings was to be limited to the presentation of her monthly report after which she would be excused from attendance. Marshall Dep. at 91–92; Board of Commissioner's Letter, doc. 19-3 at 92. With the assistance of Kinter, the Plaintiff drafted an informal complaint to the Board of Commissioners following her meeting with them, stating:

> I am writing to inform you that I have an informal complaint regarding a hostile work environment. Ever since April of 2011, I have been under constant scrutiny by some members of the 911 Board of Directors.
>
> At this time, I do not wish to pursue any formal actions, but I would like clarification as to who my direct supervision lies with. Is it the Board of Commissioners or [the 911 Board of Directors]?

Marshall Letter, doc. 19-2 at 28.

The events leading to the Plaintiff's termination began a year later in November 2012. On November 18, 2012, the Plaintiff received a call from a dispatcher at the 911 Center. Marshall Dep. at 192. The dispatcher informed the Plaintiff that the 911 Center was understaffed because two dispatchers had gone to the parking lot of the 911 Center to assist with a medical emergency involving an injured child. Id. After that phone call, the Plaintiff traveled to the 911 Center where she learned that one of the dispatchers, Bri Clark, had left in the ambulance with the injured child. Id. at 194. Upon Clark's return to the 911 Center, the Plaintiff called her into her office and questioned her about why she had left the 911 Center. Id. at 201. The Plaintiff subsequently sent Clark home for the day while she investigated what happened in the parking lot and why Clark left the 911 Center. Id.

Later that day, Defendant Steve Clark, Bri Clark's father and a County employee, called one of the Commissioners, Defendant Probst, to complain about the Plaintiff's treatment of his

daughter. Id. at 210–12. Defendant Probst informed the Plaintiff of Defendant Clark's complaint and discussed the Plaintiff's decision to send Bri Clark home for the day. Id.

The next morning, November 19, 2012, the Plaintiff met with the Board of Commissioners and Defendant Christine Palmer, the County's Human Resource Director, to discuss the events of the previous day. Id. at 222. Following the meeting, the Commissioners directed Defendant Palmer to investigate the Plaintiff's decision to discipline Bri Clark and place her on administrative leave. Probst Dep. at 52–55, doc. 50. Defendant Palmer interviewed the Plaintiff, Bri Clark, and other employees that were on duty at the 911 Center on November 18. Palmer Dep. at 22–26, doc. 40-1. Although Defendant Palmer initially concluded that the Plaintiff's handling of the situation was appropriate, Palmer Email, doc. 40-2 at 2, on December 4, the Commissioners directed the Plaintiff to take Bri Clark off administrative leave and permit her to return to work immediately, Marshall Dep. at 227.

After ordering that Bri Clark be taken off administrative leave, the Commissioners continued to investigate the events of November 18. Palmer Dep. at 36. The investigation continued throughout the month of December 2012. As a part-time employee, Bri Clark's first day back following the November 18 incident was to be December 27. Marshall Dep. at 228. On December 21, through a subordinate, the Plaintiff indicated, to Defendant Palmer that she intended to issue a verbal reprimand to Bri Clark upon Clark's return to work on December 27. Dec. 21 Palmer Email, doc. 40-2 at 10. Defendant Palmer relayed this information to the Commissioners by email and cc'ed the Plaintiff:

> Good afternoon[,] Commissioners. I am writing to you per the r[e]quest of Doyle [the Plaintiff's co-worker] at the 911 Center.
>
> Doyle called me today and advised me that Robyn [the Plaintiff] asked him to call me to advise the Board that she is going to issue a verbal reprimand to Bri Clark

for leaving her job post back on 11/18/12, **UNLESS** she receives something in writing from the Board advising otherwise.

I advised Doyle that based upon the outcome of the investigation, and per my understanding of that outcome, there is to be **no discipline to Bri for her actions that day**.

I advised Doyle that I would send you an email, and copy Robyn, per his request.

Id.

With Bri Clark's return to work imminent, the Plaintiff contacted Defendant Palmer on December 26 and asked if the Commissioners had provided her a written letter stating that Bri Clark was not to be disciplined. Palmer Dep. at 62. Defendant Palmer informed the Plaintiff that she had not received anything in writing from the Commissioners but advised the Plaintiff that she would follow-up with the Commissioners the next day. Id.

The next day, December 27, at 4:08 P.M., Defendant Palmer emailed the Plaintiff and cc'ed the Commissioners, stating that the investigation into the November 18 incident was complete and, based on the results of that investigation, the Plaintiff was not to take any disciplinary action against Bri Clark "per the direction of the Board of Commissioners." Dec. 27 Palmer Email, doc. 19-3 at 166. Unfortunately, the Plaintiff did not read this email until later the next day. Marshall Dep. at 246–47. At the conclusion of Bri Clark's shift the following morning on December 28, the Plaintiff orally reprimanded Bri Clark for her "unauthorized leave" on November 18. Id. at 246.

Shortly after issuing the oral reprimand, the Plaintiff read Defendant Palmer's December 27 email for the first time. Id. at 246–47. After reading the email, the Plaintiff shredded a written record of her reprimand of Bri Clark. Id. at 247–48. Several hours later, Defendant Palmer sent the Plaintiff an email inquiring as to why the Plaintiff disciplined Bri Clark despite the Commissioners' explicit order to the contrary. Dec. 28 Palmer Email, doc. 19–3 at 117. The

Plaintiff replied that she had not read Defendant Palmer's email from the previous day until after she had orally reprimanded Bri Clark. Marshall Email, doc. 19-3 at 118. An email exchange between the Plaintiff, Defendant Palmer, and the Defendant Commissioners ensued and a meeting between the parties was arranged. Marshall Dep. at 254–55.

On December 31, Defendant Palmer informed the Plaintiff that the Commissioners had placed her on administrative leave pending an investigation into her decision to discipline Bri Clark on the morning of December 28. Palmer Dep. at 78–79. Early in January 2013, the parties met at the Commissioners' office at which time the Plaintiff offered her account of the events leading up to and including her oral reprimand of Bri Clark on the morning of December 28. Marshall Dep. at 260–61. Meanwhile, Defendant Palmer investigated those same events, and on January 11, 2013, recommended to the Commissioners that the Plaintiff's employment be terminated because of the Plaintiff's "disrespectful, insubordinate, dishonest, and deceptive" actions with respect to her disciplining Bri Clark. Jan. 11 Palmer Email, doc. 40-2 at 12. Later that day, the Commissioners met and voted to terminate the Plaintiff's employment. Palmer Dep. at 89–90.

The Plaintiff subsequently filed an eight-count Complaint (doc. 1) alleging that the Defendants discriminated against her and wrongfully terminated her employment on account of her gender and disability and retaliated against her because of her complaints of mistreatment. In addition, the Plaintiff presented several state law tort claims of intentional infliction of emotional distress, defamation, and tortious interference with a contract.

After discovery, the Defendants filed a Motion for Summary Judgment (doc. 43). That Motion is fully briefed and ripe for resolution.

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary material in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III.    Discussion

As an initial matter, the Plaintiff does not oppose the Defendants' Motion for Summary Judgment on several claims contained in her Complaint. The Court addresses those counts first and then turns to the claims contested by the parties.

The Plaintiff does not oppose the Defendants' Motion with respect to her: disability discrimination and retaliation claims under the Americans with Disability Act and Ohio law (Count I); state law intentional infliction of emotional distress claim (Count VI); state law defamation claims (Count VII); or state law tortious interference with contract claim against Defendant Palmer (Count VIII). Pl.'s Resp. in Opp. at 18, doc. 55. The Defendants' Motion will be granted as to those claims accordingly.

The Plaintiff's remaining claims are: gender discrimination in violation of Title VII and state law (Counts II and V); retaliation in violation of Title VII and state law (Counts III and IV); and her claim of tortious interference with contract against Defendant Clark (Count VIII). The Court addresses each of these claims in turn.

A.       *Gender Discrimination Claims*

The Defendants concede that the Plaintiff can establish a prima facie case of gender discrimination based on her termination and subsequent replacement by a man.[1] Defs.' Mot. for Summ. J. at 32, doc. 43. Instead, the Defendants argue that they had a legitimate, non-discriminatory reason for terminating the Plaintiff's employment; in their view, the Plaintiff was insubordinate when she disciplined Bri Clark despite their explicit order to the contrary and deceptive and disrespectful when confronted after orally reprimanding Clark. Id. at 30–31, 35–36.

The Plaintiff assumes, for purposes of the Defendants' Motion, that the Defendants have articulated a legitimate, non-discriminatory and non-retaliatory reason for her termination. Pl.'s Resp. in Opp. at 23–24. However, she argues that the Defendants' reasons for firing her were pretextual in nature. Id. at 23–37. According to the Plaintiff, the Defendants' proffered reasons for terminating her employment were insufficient motivation for her termination or did not actually motivate her termination. Id. at 29–37. In support of these arguments, the Plaintiff emphasizes that: (1) the Defendants ordered an investigation to justify discipline for the Plaintiff, id. at 25–26; (2) the Defendants violated the County's nepotism policy when it investigated the Plaintiff based on a complaint from Defendant Clark, the father of Bri Clark, id.; (3) the Defendant Commissioners rejected Defendant Palmer's initial findings, id. at 26–27; (4) Defendant Palmer credited the statements of third parties that directly contradicted the prior statements of other third parties, id. at 27; (5) the Defendant Commissioners violated Ohio's Open Meeting law, id. at 28–29; (6) the Defendant Commissioners never officially concluded

---

[1] Ohio law claims for gender discrimination are analyzed under the same standard as Title VII claims. See McKinley v. Skyline Chili, Inc., 534 F. App'x 461, 464 (6th Cir. 2013); Myers v. Cuyahoga Cnty., Ohio, 182 F. App'x 510, 517 n.3 (6th Cir. 2006).

their investigation of the Plaintiff, id.; (7) the Plaintiff did not actually discipline Bri Clark under the terms of the Union Contract, id. at 30–31; (8) the Plaintiff was not "insubordinate" under the terms of the County Personnel Policy Manual, id. at 31–32; (9) and the Defendant Commissioners provided shifting justifications for her termination, id. at 33–37.

The Defendants challenge the underlying factual basis of many of these arguments and further dispute that the Plaintiff's arguments demonstrate that the decision to terminate the Plaintiff's employment was pretext for gender discrimination and retaliation. Defs.' Reply at 12–32.

In the Sixth Circuit, a plaintiff may establish pretext by showing that the employer's proffered reason (1) has no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 915 (6th Cir. 2013). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003) (citation and internal quotation marks omitted). "[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." Seeger v. Cincinnati Bell Telephone Co., LLC, 681 F.3d 274, 285 (6th Cir. 2012) (emphases and quotation marks omitted). "[I]f the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination . . . occurred," the employer is entitled to summary judgment. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

1.    Did Not Actually Motivate the Action

The Plaintiff does not argue that there was no basis in fact for her termination, but instead asserts that the Defendants' stated reason for terminating her employment—insubordination and deceptive and disrespectful behavior—did not actually motivate their decision to fire her. According to the Plaintiff, circumstantial evidence demonstrates that the Defendant Commissioners terminated the Plaintiff's employment because of her gender.

In order to demonstrate that a defendant's proffered reason did not actually motivate an adverse employment action, a plaintiff can "attack[ ] the employer's explanation by showing circumstances which tend to prove an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." Smith v. Leggett Wire Co., 220 F.3d 752, 759 (6th Cir. 2000) (citation and internal quotation marks omitted). Under this line of attack, "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal." Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 349 (6th Cir. 2012) (citation, internal quotation marks, and alterations omitted). Here, the Plaintiff must show that, even if she was insubordinate, deceitful, and disrespectful, it was more likely than not the Defendants terminated the Plaintiff's employment because of an illegal reason, namely, gender discrimination.

*First*, the Plaintiff argues, following the November 18, 2012 incident, the Defendant Commissioners initiated an investigation into the Plaintiff's conduct, rather than that of Bri Clark. According to the Plaintiff, "[a] jury could conclude that the mere commencement of the investigation, which was intended to justify discipline for [the Plaintiff], was a pretext for

discrimination . . . because the investigation was requested to examine the issue of discipline for Bri Clark, but the Commissioners, instead, decided to investigate [the Plaintiff]." Pl.'s Resp. in Opp. at 26.

The Court disagrees. The Plaintiff cites no case law and offers nothing more than a conclusory assertion to support her position. The Plaintiff was not disciplined as a result of the investigation. Nor did the investigation into the events of November 18 lead to a recommendation that the Plaintiff be terminated. Even when construed in a light most favorable to the Plaintiff, to infer from this account of the Defendants' investigation that gender discrimination was more likely than not the true reason for the Plaintiff's termination would require a speculative leap unsupported by the evidence.

*Second*, the Plaintiff asserts, the Defendants violated Belmont County's nepotism policy when they initiated an investigation into the events of November 18 based on the complaint of Defendant Clark, a County employee, concerning the Plaintiff's treatment of his daughter, Bri Clark. Collecting Sixth Circuit case law, the Plaintiff maintains that "[e]vidence that an employer failed to follow its own policies creates a question of fact with regard to pretext and precludes summary judgment." Pl.'s Resp. in Opp. at 26.

The parties disagree as to whether an employer's failure to follow its own policies may demonstrate pretext. On the one hand, the Sixth Circuit has opined that "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 246 (6th Cir. 2005) (citing Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996); Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir. 1995)). The Sixth Circuit has continued to cite White for this proposition in a number of cases. See, e.g., Greene v. U.S. Dep't of Veterans Affairs, No. 14-

1312, 2015 WL 1296203, at *5 (6th Cir. Mar. 24, 2015); E.E.O.C. v. Lucent Techs. Inc., 226 F. App'x 587, 592 (6th Cir. 2007).

On the other hand, one Sixth Circuit panel has characterized White's statement of the law as "mere dicta," unsupported by Supreme Court or published Sixth Circuit precedent. See Coburn v. Rockwell Automation, Inc., 238 F. App'x 112, 127 n.2 (6th Cir. 2007). Further, the Plaintiff identifies two cases in which the Sixth Circuit found that an employer's failure to follow its own procedures constituted evidence of pretext. In Deboer v. Musashi Auto Parts, Inc., the employer's handbook called for counseling of employees prior to their termination or demotion. 124 F. App'x 387, 394 (6th Cir. 2005). There, the defendant failed to counsel the plaintiff prior to demoting her, and the court considered this evidence to "have some small probative value" as to whether the employer's proffered reason for her demotion was pretext for discrimination. Id. Similarly, in Brewer v. New Era, Inc., the employer produced a number of documents indicating the existence of a seniority policy concerning layoffs. 564 F. App'x 834, 841 (6th Cir. 2014) There, the defendant failed to adhere to its seniority policy when it terminated the plaintiff's employment as part of a layoff. Id. When considered in combination with other evidence of pretext, the court concluded that the plaintiff had presented sufficient evidence to create a genuine issue of material fact as to whether the defendant's proffered reason for his termination was pretext for discrimination. Id.

In the Court's view, whatever tension exists between these cases can be resolved without difficulty. As a general rule, an employer's failure to follow its own policies will be insufficient *by itself* to establish pretext. However, such a failure may have some probative value when considered in combination with other evidence of pretext, particularly where an employer's fails

"to follow a policy that is related to termination or demotion," <u>Deboer</u>, 124 F. App'x at 394 (citing <u>Skalka v. Fernald Envtl. Restoration Mgmt. Corp.</u>, 178 F.3d 414, 421–22 (6th Cir. 1999)).

Here, the County's nepotism policy states that "a public official/board member is prohibited from soliciting or using his authority to influence, formally or informally, to secure the employment of a 'related' employee, or to otherwise act with respect to that related individual's employment." Nepotism Policy, doc. 40-2 at 19. Defendant Clark is alleged to have violated this rule with respect to his daughter's employment at the 911 Center. Although the County's policy is generally related to termination or demotion, on the facts before the Court, it had a tangential relationship to the Plaintiff's own termination. At best, it provides weak evidence of pretext in this case.

*Third*, the Plaintiff emphasizes, the Defendant Commissioners rejected Defendant Palmer's initial findings that Bri Clark should be issued a reprimand for leaving her post and that the Plaintiff handled the events of November 18 in an appropriate manner. Instead of ending the investigation, the Defendant Commissioners directed Defendant Palmer to continue to collect additional information about the events of November 18. According to the Plaintiff, from these facts, "[a] jury could infer that the Commissioners' rejection of the investigation findings demonstrated their desire to find wrongdoing on the part of [the Plaintiff] so that she could be terminated to put an end to her complaints of hostile work environment and discrimination." Pl.'s Resp. in Opp. at 27.

Again, the Plaintiff cites no case law and offers nothing more than a conclusory assertion to support her position. When construed in the light most favorable to the Plaintiff, the record indicates that the Defendant Commissioners rejected Defendant Palmer's initial findings; Defendant Palmer took statements from witnesses favorable to Bri Clark; those statements

contradicted prior statements by witnesses to the events of November 18; and based on the statement of those witnesses favorable to Bri Clark, the Defendant Commissioners and Defendant Palmer concluded that Bri Clark should not be subject to any discipline. The Defendants did not, however, impose any discipline on the Plaintiff. These facts support the inference that the Defendant Commissioners were interested in exonerating Bri Clark of any wrongdoing. But they do not support an inference that the Defendants continued the investigation into the events of November 18 to entrap the Plaintiff or create grounds for terminating her to cover up their true motive for firing her, gender discrimination.

*Fourth*, the Plaintiff contends, the Defendants made an official decision concerning the disciplining of Bri Clark without holding an executive session at a properly-noticed public meeting, a clear violation of the Ohio Open Meetings law; without reaching any conclusions or investigations; and without communicating the outcome of the investigation to Defendant Clark. Pl.'s Resp. in Opp. at 28–29. In light of these facts, the Plaintiff insists that the Defendants' investigation was a "sham" designed to "seek facts to justify terminating [the Plaintiff's] employment." Id. at 29. It is unclear to the Court how these facts support this conclusion. They provide little, if any, evidence of pretext on the part of the Defendants.

In the Court's view, these four arguments support an inference that the Defendants might have conducted the investigation with the intent to exonerate Bri Clark. However, the grounds explicitly relied upon by the Defendant Commissioners to justify the Plaintiff's termination were not the result of this investigation but occurred after the investigation ended. Based on their investigation, the Defendant Commissioners concluded that Bri Clark should not be disciplined; no one suggested that the Plaintiff herself should be disciplined, let alone fired. The Plaintiff's arguments go to what motivated the Defendants' investigation, not what motivated their decision

to terminate the Plaintiff. Consequently, these four arguments do not support an inference that the Plaintiff's insubordination did not actually motivate the Defendants' decision to terminate the Plaintiff's employment.

*Finally*, the Plaintiff argues that the Defendants have provided shifting justifications over time for the Plaintiff's termination. According to the Plaintiff, the Defendants and their agents, have made a number of statements offering conflicting reasons for the Plaintiff's termination, including:

- The County's attorney, Mark Lucas, notified the Plaintiff of her termination by telephone and represented that she was terminated, "[t]o take the 911 center into a better direction." At that time, Lucas did not indicate that Defendants terminated her because of her insubordination or dishonesty;

- The Defendant Commissioners issued a press release, stating that they terminated the Plaintiff's employment because of her decision to discipline Bri Clark;

- The Defendant Commissioners informed a third party that they terminated the Plaintiff's employment because she brought her husband to a meeting with the Commissioners;

- Defendant Commissioners Probst and Coffland testified that they terminated the Plaintiff's employment because of her decision to discipline Bri Clark;

- Defendant Commissioner Favede testified that the Defendant Commissioners terminated the Plaintiff's employment because she was insubordinate and deceptive, not because she disciplined Bri Clark.

Pl.'s Resp. in Opp. at 34–36. In the Plaintiff's view, these shifting justifications and conflicting statements are sufficient to create a genuine issue of material fact on the issue of pretext.

"An employer's changing rationale for making an adverse employment decision can be evidence of pretext." Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1167 (6th Cir. 1996). See also Cicero v. Borg–Warner Auto, Inc., 280 F.3d 579, 592 (6th Cir. 2002) (stating that shifting justifications can create a genuine issue of fact whether a proffered reason is pretext). In

Thurman, the plaintiff, an African-American, worked for the defendant, a common carrier, as a "casual employee." 90 F.3d at 1164. He sought to become a full-time employee, and despite satisfying all of the requirements necessary to become one, the defendant did not hire him and hired five white employees instead. Id. at 1164–65. When the plaintiff questioned the defendant's manager why he had not been hired, the manager made no mention of the plaintiff's work performance. Id. at 1167. However, in discovery, the defendant asserted that the plaintiff was "at best an average worker" and that his performance level waned prior to his applying to become a full-time employee. Id. Further, in a pretrial order, the defendant asserted that it did not hire the plaintiff as a regular employee "due to poor performance." Id. The court concluded that the defendant's changing rationale for its decision not to hire the plaintiff warranted an inference of pretext. Id.

The facts in Thurman are distinct from those presently before the Court. Here, the Defendants' explanation for terminating the Plaintiff's employment has remained consistent throughout the course of this litigation. The Plaintiff compares her initial conversation with Mark Lucas, the County's attorney, following her termination to the press release that the Defendants issued several days later. Lucas explained that the Plaintiff was terminated to "take the 911 Center in a better direction" while the press release stated that the Plaintiff was terminated because of her decision to discipline Bri Clark despite the Defendant Commissioners order to the contrary. Lucas's "better direction" comment was a generic statement that could reasonably be read to encompass the press release's proffered reason for the Plaintiff's termination. In the Court's view, the "logic [of Thurman] applies when an employer's reason for allegedly discriminatory actions changes in a *material* way throughout the stages of litigation." Kranz v. Gray, 842 F. Supp. 2d 13, 24 (D.D.C. 2012) (emphasis added) (collecting cases). The

explanations offered by Lucas and the press release are not inconsistent with one another and, therefore, do not constitute the type of material change in rationale required to establish pretext.

The Plaintiff further contends that one of the Defendant Commissioners asserted that she was terminated for bringing her husband to a meeting with the Commissioners. If true, this could be considered evidence of a changing rationale for the Plaintiff's termination. However, a review of the record does not support the Plaintiff's position. Scott Mazzulli, the Plaintiff's brother-in-law, had a conversation with at least one of the Defendants following the Plaintiff's termination:

| | |
|---|---|
| Counsel: | Did you ever have a conversation with Ginny Favede about the reasons why Mr. Marshall was let go? |
| Mazzulli: | The reasons why she was let go? |
| Counsel: | Yes. |
| Mazzulli: | I'm trying to recall having a conversation. I think I was out here for a regular commissioners' meeting that I attend every once in a while, depending on what's going on, if it's dealing with economic development or whatever. I don't know if it was Ginny or if it was Matt that the conversation might – I'm trying to think how it was. It was something to the effect of why she got terminated or how she got terminated or whatever. And one of them said something about she had brought her husband. I don't recall the exact conversation. |
| . . . | |
| Counsel: | And there had been some mention of Ms. Marshall bringing her husband to something? |
| Mazzulli: | Yes. |
| Counsel: | Do you remember anything else about that conversation? |
| Mazzulli: | I think somebody said Robyn wanted to take her husband into the meeting with her, and they wouldn't allow it to happen. And then a decision was made to terminate her. |
| Counsel: | That's all you remember? |

        Mazzulli:       Yeah.

Mazzulli Dep. at 22–23, doc. 55-4. In the Court's view, this testimony does not support the assertion that the Defendants made a statement to the effect that the Plaintiff was terminated because she brought her husband to a meeting with the Defendants. As a result, it does not support the conclusion that the Defendants offered shifting justifications for the Plaintiff's termination.

        According to the Plaintiff, the present case is similar to Pierson v. Quad/Graphics Printing Corp., 749 F.3d 530 (6th Cir. 2014). In Pierson, the plaintiff worked as a manager at the defendant's factory. Id. at 532. As part of a company-wide cost-cutting initiative, executives for the defendant began to "review every position within the company" to "make a determination on whether those positions were truly needed." Id. After reviewing the plaintiff's position, executives for the defendant concluded that his position could be terminated without impacting the defendant's performance. Id. at 533–34. Following the plaintiff's termination, a younger employee assumed his responsibilities, and the plaintiff filed a lawsuit claiming that the defendant discriminated against him on the basis of his age. Id. at 534.

        To demonstrate pretext, the plaintiff emphasized the shifting justifications offered by the defendant. Initially, the defendant asserted that the plaintiff was terminated because his position "could be eliminated without hardship to the company." Id. at 541. Later, however, the defendant stated that the plaintiff was terminated because he was not a "team player." Pierson, 749 F.3d at 541. When the defendant actually informed the plaintiff of his firing, the defendant made no mention of any performance-related problems. Id. But when the plaintiff questioned the defendant about appealing his termination, a company representative informed him that he was terminated for performance reasons and not his age. Id. Because these shifting justifications

raised an inference that the defendant's proffered reasons for the plaintiff's termination were false, the court of appeals reversed the district court's grant of summary judgment in the defendant's favor. Id.

Pierson, like Thurman, provides a clear example of circumstances under which a court can conclude that an employer's changing rationale for making an adverse employment decision rises to the level of pretext. But Pierson is of little help to the Plaintiff here. As discussed above, unlike Pierson, the record in this case does not evidence shifting justifications for the Plaintiff's termination.

More concerning is the Plaintiff's contention that the Defendant Commissioners do not agree why they terminated the Plaintiff's employment. According to the Plaintiff, Defendant Favede's testimony directly contradicts Defendant Probst's and Defendant Coffland's assertion that the Plaintiff was terminated for disciplining Bri Clark. "Inconsistent reasons given by key decision-makers as to the reason for the firing can provide evidence of pretext." Gaglioti v. Levin Grp., Inc., 508 F. App'x 476, 483 (6th Cir. 2012) (citing Tinker v. Sears, Roebuck & Co., 127 F.3d 519, 523 (6th Cir. 1997)). In Gaglioti, the defendant's president and comptroller offered contradictory explanations for the plaintiff's termination; the president maintained that the plaintiff was fired for performance reasons while the comptroller asserted that the plaintiff was terminated because of lack of work and insisted that his "work performance 'didn't have anything to do with why he was fired.'" 508 F. App'x at 482–83. Similarly, in Tinker, the court reviewed the testimony of the defendant's managers and found that two of the managers recommended terminating the plaintiff's employment for "entirely different" reasons. 127 F.3d at 523. In both cases, the Sixth Circuit concluded that these inconsistencies demonstrated a

genuine issue of material fact concerning the defendant's proffered reasons for terminating the plaintiff.

Here, the Plaintiff outlines the perceived inconsistencies in the Defendant Commissioners' deposition testimony concerning their decision to fire her:

> Both Commissioners Probst and Coffland agree that the *sole reason* for Ms. Marshall's termination was her issuing discipline to Bri Clark. Commissioners Probst and Coffland also agree that Ms. Marshall was not insubordinate in either asking that the commissioners communicate in writing or in disagreeing with decision made by the commissioners.
>
> In contrast, Commissioner Favede adamantly stated, "She [Ms. Marshall] was not terminated for disciplining." Commisioner Favede testified that Ms. Marshall was terminated for being "insubordinate" and "deceptive." Favede describes the "insubordination" as: 1.) requesting the commissioners put something in writing regarding Bri Clark, 2.) having a "general attitude" of insubordination, 3.) being "angry," and 4.) disagreeing with the decision(s) of the commissioners. Favede describes the "deception" as Ms. Marshall not notifying Ms. Palmer or the commissioners that Ms. Marshall had issued discipline to Bri Clark before Ms. Marshall received the email on December 28, 2012.

Pl.'s Resp. in Opp. at 35–36 (internal citations omitted). In light of these facts, the Plaintiff concludes that "[t]he explanation provided by the Commissioners directly conflict with one another regarding the reason(s) for Ms. Marshall's termination." Id. at 36.

The record does not support the Plaintiff's characterization of Defendant Favede's deposition testimony. At her initial deposition, Defendant Favede testified concerning her decision to terminate the Plaintiff's employment:

| Counsel: | Did you vote to terminate Robyn Marshall? |
|---|---|
| Favede: | Yes, I did. |
| Counsel: | What were the reasons for that? |
| Favede: | Insubordination, the actions that took place in regards to reprimanding her were considered deceptive. It was a very difficult and almost volatile situation. Ms. Palmer had again made a recommendation and this time we did agree with her recommendation and it was to relieve her of her duties. |

| Counsel: | Anything else? Any other reasons that Ms. Marshall was terminated? |
|---|---|
| Favede: | It was [Ms. Palmer's] recommendation and our agreement that she was deceptive in the manner in which she handled this situation and she was insubordinate in the way she reacted to the commissioners. |
| Counsel: | Any other reason she was terminated? |
| Favede: | No, not to my recollection. |

Favede Dep. at 96–97, doc. 36-1. Defendant Palmer recommended that the Plaintiff be terminated because she was "disrespectful, insubordinate, dishonest, and deceptive" with respect to her disciplining Bri Clark. Palmer Dep. at 84. Specifically, Defendant Palmer found that the Plaintiff was insubordinate because she disciplined Bri Clark despite Defendant Palmer instructing her by email and telephone on November 21 that the Defendant Commissioners did not want Bri Clark to be disciplined. Id. at 86–87. In adopting Defendant Palmer's recommendation, Defendant Favede endorsed her finding that the Plaintiff was insubordinate, as did Defendants Probst and Coffland.

Continuing, Defendant Favede explained why she believed the Plaintiff was insubordinate:

| Counsel: | How was Robyn Marshall insubordinate? |
|---|---|
| Favede: | Refusing to – demanding something in written form, refusing to do what we had decided, demanding it in written form and then subsequently doing it anyways. |
| Counsel: | So she was insubordinate by asking that the board's direction be placed in writing? |
| . . . | |
| Favede: | Yes. |

Counsel:        And . . . how was she insubordinate?

. . .

Favede:         I think in general the entire attitude she had was insubordinate.

Counsel:        In what way?

Favede:         She was very angry.

. . .

Counsel:        Is it insubordinate for a director to disagree with the conclusions of the Board of Commissioners? Is that insubordinate?

Favede:         Yes.

Counsel:        So directors aren't allowed to disagree; is that right?

Favede:         Once the Board of Commissioners have made a formal decision, it's inappropriate.

Counsel:        That's not what I asked. I asked if it's insubordinate.

Favede:         Depends on the circumstances.

Counsel:        Well, in this circumstance was it –

Favede:         Yes, it was.

Counsel:        It was insubordinate for her to disagree with your decision?

Favede:         There's a difference between disagreeing and going ahead and going against the wishes of the board.

Counsel:        Well, those are two different things. You told me that she was insubordinate by disagreeing.

Favede:         She was insubordinate by taking the action when we make the decision not to discipline her.

Counsel:        Was she insubordinate by disagreeing with your decision?

Favede:         Yes.

Id. at 97–100. From these statements, the Plaintiff concludes that Defendant Favede terminated her because she: 1) requested the commissioners put something in writing regarding Bri Clark, 2) had a "general attitude" of insubordination, 3) was "angry," and 4) disagreed with the decisions of the commissioners. Pl.'s Resp. in Opp. at 35–36. But in so concluding, the Plaintiff ignores Defendant Favede's statement that the Plaintiff "was insubordinate by taking action when we [made] the decision not to discipline [Bri Clark]." Favede Dep. at 100, doc. 36-1. This is consistent with Defendant Favede's original statement that she terminated the Plaintiff on the basis of Defendant Palmer's recommendation.

Finally, Defendant Favede explained her belief that the Plaintiff was deceptive after disciplining Bri Clark on the morning of December 28:

| Counsel: | You also said that Ms. Marshall was deceptive. How was she deceptive? |
|---|---|
| Favede: | She disciplined Miss Clark early in the morning, then got the email, then had a conversation with Christi Palmer, didn't share that, didn't share it with us, didn't share it with the HR director who had been handling this over a month, and we weren't notified until Ms. Clark contacted Ms. Palmer and told her. |
| Counsel: | So she was deceptive by not telling you she issued the reprimand before she received the email and that that she had, in fact, when she got the email, shredded the reprimand? She was deceptive by not saying that; is that what you're telling me? |
| Favede: | Knowing that she knew beyond that email that came on that particular day that she had known that we did not want her disciplined, yes. |

Id. at 100–01. To the extent that Defendant Favede justified her vote to terminate the Plaintiff's employment based on the Defendant's alleged deceptive behavior, that justification is not inconsistent with the Defendant Commissioners' insubordination rationale. Absent *inconsistent*

justifications, this evidence does not support a finding of pretext. See Gaglioti, 508 F. App'x at

483 (6th Cir. 2012) (citing Tinker, 127 F.3d at 523).

At her second deposition, Defendant Favede sought to clarify an apparent misstatement

regarding the authority of a department head, such as the Plaintiff, to issue discipline to County

employees:

> Favede: [W]hat I wanted to convey is that apparently it is common that department heads do internal disciplining as far as writing up employees to the extent of – until you get to the point of suspension or termination and then it's brought . . . to the board of commissioners.

> Counsel: Okay. So what you're talking about is your prior testimony . . . that you did not believe that any of the department heads that are under the purview of the county commissioners issued any discipline to their employees without first getting the approval of the commissioners; is that the testimony you're referring to?

> Favede: Yes.

> . . .

> Counsel: And you have learned that . . . county department heads . . . do . . . issue discipline, at least up to suspensions, without getting the permission of consulting with the county commissioners, correct?

> Favede: Yes.

Favede Dep. at 5, doc. 49-1.

In light of this new information, Defendant Favede elaborated on her decision to vote in

favor of terminating the Plaintiff's employment:

> Counsel: And has this new information that you've learned changed any of your testimony or opinions regarding how Robyn Marshall's case was handled?

> Favede: In how it was handled, when I speak for myself I was addressing – in my actions I was addressing that particular action that was taken with everything else being separated from it, you know. We asked her not to do it. She chose to do it. My decision was based on that.

. . .

| | |
|---|---|
| Counsel: | I just want to clarify, because I'm not sure I actually got an answer, and my question was knowing what you know now, does that change any of your opinions or positions about the way Robyn's case was handled? I'm not sure you actually answered that question. |
| Favede: | In regards to writing Bri up, we specifically asked her not to do it. The action was taken based upon the insubordination of that action. |

. . .

| | |
|---|---|
| Counsel: | My only question is has anything changed about your opinion about getting involved in this discipline based upon what you know now? |
| Favede: | There are two issues in my mind that are at hand. One is the fact that directors are disciplining their employees. The second one here is that we specifically asked for a specific employee and a specific circumstance not be disciplined. |
| Counsel: | I don't understand your answer. My only question is have you changed – |
| Favede: | She wasn't terminated for disciplining. She was terminated for disobeying or being insubordinate – excuse me, I Don't like the word disobeying, insubordinate to her three board of commissioner bosses. |
| Counsel: | And the insubordination was based upon the fact that Christine Palmer sent her an email telling her not to issue the discipline; is that correct? |
| Favede: | And she took action anyway, yes. |

Id. at 9–12. When read in isolation, Defendant Favede's statement that Bri Clark "wasn't

terminated for disciplining" appears inconsistent with the testimony of Defendant Probst and

Defendants Coffland. However, when read in context, Defendant Favede's statement offers no

support for the Plaintiff's argument. As Defendant Favede made clear above, the Plaintiff's

decision to discipline Bri Clark *in and of itself* was not the cause of her termination. Rather, the Plaintiff was terminated for disciplining Bri Clark *contrary to the Defendant Commissioners' explicit order*. By contravening the Defendant Commissioners' order, the Plaintiff was insubordinate, and all three Defendant Commissioners cited this fact to justify their decision to terminate the Plaintiff's employment.

A fair reading of the record does not support the Plaintiff's argument that the Defendant Commissioners offered inconsistent reasons for terminating her employment. Instead, the evidence before the Court demonstrates that all three Defendant Commissioners terminated the Plaintiff based on her insubordination and that Defendant Favede voted to terminate the Plaintiff's employment for additional, but not inconsistent, reasons. Under these circumstances, an inference of pretext is not warranted in this case.

2.      Insufficient to Warrant the Action

The Plaintiff also argues that the Defendants' proffered reasons were insufficient to justify her termination. According to the Plaintiff, the circumstances surrounding the investigation into the events of November 18 were confusing to all involved and she rescinded Bri Clark's reprimand after reading Defendant Palmer's email. Moreover, the Plaintiff maintains that under the terms of the Union Contract she did not actually "discipline" Bri Clark, and, under the terms of the County's Personnel Policy Manual, she was not actually "insubordinate." In the Plaintiff's view, "[t]he drastic step of immediate termination of [the Plaintiff's] employment does not fit the proverbial crime." Pl.'s Resp. in Opp. at 30.

This "category of pretext consists of evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in

substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." Chattman v. Toho Tenax America, Inc., 686 F.3d 339, 349 (6th Cir. 2012) (quoting Manzer, 29 F.3d at 1084). In other words, the Plaintiff must establish that she was treated less favorably than similarly-situated, non-protected employees. Manzer, 29 F.3d at 1084. "A showing of the third type of pretext is a direct attack on the credibility of the employer's proffered motivation for disciplining the plaintiff and, if shown, 'permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case.'" Chattman, 686 F.3d at 349 (quoting Manzer, 29 F.3d at 1084). "In other words, it creates a genuine, triable issue of material fact." Chattman, 686 F.3d at 349.

Here, the Plaintiff has not presented any "evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." Chattman, 686 F.3d at 349. Absent such evidence, the Plaintiff's argument that the Defendants' proffered reasons were insufficient to justify her termination fails.

The Plaintiff cites a number of cases to support her argument that her actions were insufficient to justify her termination. In Hill v. Air Tran Airways, the plaintiff worked as a customer service agent for the defendant. 416 F. App'x 494, 495 (6th Cir. 2011). The plaintiff had an acrimonious relationship with his supervisor, who reprimanded the plaintiff on multiple occasions for reasons ranging from the plaintiff's tardiness to the plaintiff arguing with customers. Id. Suspecting that racial discrimination was motivating his supervisor's conduct, the plaintiff complained of his treatment to the station manager and filed a formal complaint Id. at 496.

Several months after filing his complaint, on April 10, 2007, the plaintiff was assigned to work as the primary ticket counter agent for several early morning flights. Id. The plaintiff checked in most of the passengers for two of those flights and then took a 15 minute coffee break. Id. While the plaintiff presented evidence that coffee breaks were accepted as part of an informal company policy, other employees testified to the contrary. Id. at 496 n.2. After returning from his break, the plaintiff's co-workers did not help him complete the check-in process for the remaining passengers. Hill, 416 F. App'x at 496. This led to a confrontation between the plaintiff, his co-workers, and his supervisor. Id. As a result of that confrontation, the plaintiff was ultimately suspended and terminated. Id. at 497.

To justify the plaintiff's termination, the defendant argued, *inter alia*, that the plaintiff was terminated for taking an unauthorized break. Id. at 499. In response, the plaintiff asserted that this was a pretext for retaliation, arguing that his taking of an allegedly unauthorized break was insufficient to motivate the defendant's decision to terminate him. Id. at 500. Agreeing with the plaintiff, the court of appeals emphasized that the plaintiff presented evidence that similarly-situated co-workers also took a break on the morning of April 10, 2007, but that they were not terminated and were instead given only written warnings. Id. As a result, the court concluded that the plaintiff had presented sufficient evidence to create a genuine issue of material fact as to the issue of pretext. Hill, 416 F. App'x at 501.

Hill is therefore of little help to the Plaintiff here. Unlike the present case, the plaintiff in Hill identified similarly-situated co-workers who engaged in the same conduct as him, but were not terminated as a result of that conduct. Because the Plaintiff does not point to similar evidence here, her argument that the Defendants' proffered reasons were insufficient to justify her termination fails under the third category of demonstrating pretext.

Although the Plaintiff's argument is insufficient to establish pretext under the third category of the tripartite pretext formula, the Sixth Circuit has reminded courts that with respect to that formula "it is important to avoid formalism in its application, lest one lose the forest for the trees." Chen v. Dow Chem. Co., 580 F.3d 394, 402 n.4 (6th Cir. 2009). As the Chen court explained:

> Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is. One can distill the inquiry into a number of component parts, and it can be useful to do so. But that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination.

580 F.3d at 402 n.4 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993); Forrester v. Rauland-Borg Corp., 453 F.3d 416 (7th Cir. 2006)). See also Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012) (stating, with respect to the three categories for demonstrating pretext, that "we have never regarded those categories as anything more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?' As we have stated, 'at bottom the question is always whether the employer made up its stated reason to conceal intentional [discrimination].'").

With this admonition in mind, the Court must consider whether the evidence presented by the Plaintiff casts doubt on the Defendant's explanation for terminating her employment. The Defendants assert that they terminated the Plaintiff's employment because she disciplined Bri Clark despite their order to the contrary. The Plaintiff maintains that: (1) she did not discipline Bri Clark under the terms of the Union Contract; (2) she rescinded Bri Clark's discipline after reading Defendant Palmer's email; and (3) she was not insubordinate under the terms of the

County Personnel Policy Manual. The Defendants contest the factual accuracy of these arguments. Defs.' Reply at 27–28.

Even assuming that the Plaintiff's arguments are correct as a matter of fact, the Court does not believe they support an inference of pretext in this case. Nothing in the record suggests that the Defendant Commissioners relied on the formal definitions of "discipline" and "insubordination" in terminating the Plaintiff's employment. Instead, the record demonstrates that Defendants employed those terms in a colloquial fashion, consistent with their common usage.

On December 21, 2012, the Defendant Commissioners, through Defendant Palmer, informed the Plaintiff by telephone and email that she should not discipline Bri Clark when Clark returned to work. Nonetheless, on Bri Clark's first day back at work after the November 18 incident, the Plaintiff issued Bri Clark an oral reprimand. The Plaintiff maintains that, when she issued the oral reprimand, she was confused as to the status of the Defendants' investigation into the events of November 18 and that the Defendants failed to provide her anything in writing directing her not to discipline Bri Clark. According to her, the decision to terminate her employment was a drastic and irrational response to her decision to orally reprimand of Bri Clark.

Perhaps another more forgiving employer would not have terminated the Plaintiff's employment under these circumstances. But that such an employer might exist does not support an inference the Defendants made up their stated reason for terminating the Plaintiff's employment to conceal intentional discrimination.


3.      The Plaintiff has failed to establish pretext

To demonstrate pretext, a plaintiff must show that her employer's proffered reason for terminating her employment "was not the real reason for its action, *and* that the employer's real reason" was discrimination. E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 767 (6th Cir. 2015) (en banc). The Defendants' investigation into the events of November 18 and their handling of the Plaintiff's termination were not models of human resource management, but "so long as an employer honestly and reasonably believed the nondiscriminatory reason for its action, the employer need not use an 'optimal' decision-making process that leaves 'no stone unturned.'" Crabtree v. Sec'y, U.S. Dep't of Homeland Sec., No. 14-3868, — F. App'x —, 2015 WL 1948267, at *4 (6th Cir. May 1, 2015) (quoting Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 285 (6th Cir. 2012)). Here, all three Defendant Commissioners testified that they believed that the Plaintiff was insubordinate when she disciplined Bri Clark despite their explicit instructions to the contrary and that they terminated her employment accordingly.

Although the Court may not have terminated the Plaintiff's employment if it were in the Defendants' position, the Court is not "a super personnel department, overseeing and second guessing employers' business decisions." Bender v. Hecht's Dep't Stores, 455 F.3d 612, 627 (6th Cir. 2006) (citation and internal quotation marks omitted). Ultimately, there is insufficient evidence for a jury to conclude that the Defendants' reasons for terminating the Plaintiff were false and that discrimination was the true reason for the Plaintiff's termination. The record before the Court contains no credible evidence of pretext. The Defendants are therefore entitled to summary judgment. See Reeves, 530 U.S. at 148.

B.      *Retaliation Claims*

Next, the Plaintiff argues that the Defendants terminated her employment in retaliation for her ongoing complaints regarding a hostile work environment and gender discrimination.[2] The Defendants respond that (1) the Plaintiff did not engage in protected activity in 2012; (2) there is no causal connection between the Plaintiff's complaints of sexual harassment and her termination; and (3) the Plaintiff failed to establish that the legitimate, nondiscriminatory reasons proffered for her termination were pretextual in nature. Defs.' Mot. for Summ. J. at 39–40; Defs.' Reply at 5–32. The Plaintiff vigorously contests these arguments. Pl.'s Resp. in Opp. at 20–23; Pl.'s Sur Reply, doc. 60.

Title VII prohibits employers from retaliating against any employee who (1) "opposed any practice made an unlawful employment practice by this subchapter," or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U .S.C. § 2000e–3(a). To establish a prima facie case of retaliation under Title VII, the plaintiff must demonstrate that: (1) he engaged in protected activity; (2) the defendant(s) knew of that protected activity; (3) the defendant(s) took a materially adverse action against him; and (4) a causal connection existed between the materially adverse action and the protected activity. E.E.O.C. v. New Breed Logistics, — F.3d —, 2015 WL 1811018, at *6 (6th Cir. Apr. 22, 2015) (citing Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013)). If a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to provide a legitimate, nonretaliatory reason for its materially adverse action. New Breed Logistics, 2015 WL 1811018, at *6 (citing Canitia v. Yellow Freight Sys., Inc., 903 F.2d 1064, 1066 (6th Cir. 1990)). If the defendant satisfies this burden, the plaintiff must then show that the defendant's proffered reasons were a pretext for retaliation. New Breed Logistics, 2015 WL 1811018, at *6

---

[2] Ohio law claims for retaliation are analyzed under the same standard as Title VII claims. Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 544 (6th Cir. 2008).

(citing <u>Hicks</u>, 509 U.S. at 515–16; <u>Texas Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 256, (1981)).

1.      Protected Activity/Causal Connection

The Plaintiff maintains that she continued to complain of a hostile work environment and gender discrimination to the Defendants throughout 2012 and until she was fired in January 2013. According to the Plaintiff, these complaints constituted protected activity. In support of her argument, the Plaintiff relies on the deposition testimony of Defendant Probst and her own affidavit. <u>See</u> Pl.'s Resp. in Opp. at 20–23; Pl.'s Sur-Reply at 1–8.

The Defendants argue that the Plaintiff's 2012 complaints did not rise to the level of protected activity. In their view, the Plaintiff mischaracterizes the deposition testimony of Defendant Probst. Further, they argue, her affidavit offers only conclusory allegations that are insufficient to withstand a motion for summary judgment. According to the Defendants, the Plaintiff, at best, made vague complaints of unlawful behavior which are insufficient to rise to the level of protected activity.

On the record before the Court, the Defendants have the better of the argument. A vague complaint of discrimination is insufficient to rise to the level of protected activity. <u>Blizzard v. Marion Tech. Coll.</u>, 698 F.3d 275, 288 (6th Cir. 2012) (citation omitted). There is no dispute that the Plaintiff engaged in protected activity in 2011. Indeed, the conduct of the 911 Board members and various County employees complained of by the Plaintiff then—the "Director Cunt" t-shirt and threats of physical assault—was reprehensible and could have supported a viable sexual harassment or hostile work environment claim. However, the question before the Court now is whether the Plaintiff made specific complaints of a hostile work environment and

gender discrimination to the Defendant Commissioners during 2012. Here, the record indicates that she did not.

Defendant Probst testified to the following concerning the Plaintiff's 2012 complaints:

| | |
|---|---|
| Counsel: | Were you aware that there were some issues when Robyn Marshall was the 911 director about her complaining about her treatment by the 911 Board? |
| Probst: | Yes. |
| Counsel: | What were you aware of exactly? |
| Probst: | That there was a shirt that somebody said that they were going to have made. |
| Counsel: | The one that said Director Cunt? |
| Probst: | Yes, ma'am. |
| . . . | |
| Counsel: | What else did you know – |
| Probst: | From time to time Robyn would tell me that she thought that she was being treated unfairly, that they don't treat – not treating her the same as they treated Cliff [the former director of the 911 Center]. |
| Counsel: | Do you ever remember a conversation with Robyn in which she said something to the effect of, "I wouldn't be treated this way if I had a swinging dick?" |
| Probst: | I don't remember that. |
| Counsel: | You were aware that she was complaining she was being treated differently because she was a woman, weren't you? |
| Probst: | No. |
| Counsel: | No? |
| Probst: | No. |

35

| Counsel: | Well, you just told me that she complained she was being treated differently than Cliff, who's a man. What did you think – |
|---|---|
| Probst: | But there was nothing beyond that. She would make that statement, but why? I can't answer the question why, that's why I'm saying no. |
| Counsel: | Well, that's my question to you. You didn't draw an inference from that? |
| Probst: | No. I mean, when she would tell me, we would talk about it and see what was going on, but she never really got into detail. Robyn never got into detail about why she was being treated differently. |

. . .

| Counsel: | So how often did you talk with Robyn [the Plaintiff] about her complaints? |
|---|---|
| Probst: | Sporadically from time to time when I would show up for meeting, come to the 911 Board meetings or stop in. |
| Counsel: | Did she continue to complaint to you right up to the time that she was terminated off and on? |
| Probst: | Yes. |

Probst Dep. at 38–41. A fair reading of this exchange is that the Plaintiff complained about her treatment as the 911 Director to Defendant Probst until the time she was terminated, but Defendant Probst did not understand her to be complaining about gender discrimination because she did not "go[] into detail about why she was being treated differently," id. at 40.

The Plaintiff also points to her own sworn affidavit as evidence of her engaging in protected activity in 2012. But given its conclusory nature, it offers no support for her position. In her affidavit, the Plaintiff avers only that "[her] complaints to the Commissioners regarding sexual harassment and gender discrimination continued right up until the time that [she] was terminated." Marshall Aff. at ¶ 4, doc. 55-12. Absent any specific details, the Plaintiff's affidavit fails to establish that she engaged in protected activity in 2012.

Because the Plaintiff has failed to establish that she engaged in protected activity in 2012, she cannot demonstrate a causal connection between her 2011 protected activity and her termination. "In order to establish a causal connection between the protected conduct and the adverse action, [a] plaintiff must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse employment action] would not have occurred but for his engagement in protected activity." Eckerman v. Tenn. Dep't of Safety, 636 F.3d 202, 209 (6th Cir. 2010). A causal link can be shown through direct or circumstantial evidence. Dye v. Office of the Racing Comm'n, 702 F.3d 286, 305 (6th Cir. 2012). The Sixth Circuit has recognized that, in some cases, temporal proximity alone between the protected activity and the adverse employment action may be sufficient to establish a causal connection in a retaliation case. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523–26 (6th Cir. 2008).

Here, the Plaintiff's 2011 protected activity occurred more than a year prior to her termination. The lack of temporal proximity between this protected activity and her termination prevents her from establishing a causal connection between the two events. See Dixon v. Gonzales, 481 F.3d 324, 334 (6th Cir. 2007) ("This Court typically [has] found the causal connection element [is] satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity"). Therefore, the Defendants are entitled to summary judgment on the Plaintiff's retaliation claims.

2.     Pretext

Assuming *arguendo* that the Plaintiff established a prima facie case of retaliation, her retaliation claims fail nonetheless. The Plaintiff has conceded that the Defendants had legitimate, nonretaliatory reasons for her termination, but she has failed to demonstrate that the Defendants'

proffered reasons for terminating her employment were pretextual. For the same reasons as discussed in Section (A)(1)-(3) *supra*, the Court will grant the Defendants' Motion for Summary Judgment with respect to the Plaintiff's retaliation claims.


## C.     *Tortious Interference*

The Plaintiff asserts that Defendant Clark tortiously interfered with the Plaintiff's business relationship with the County. Specifically, the Plaintiff alleges that Defendant Clark complained to Defendant Probst regarding her disciplining of Bri Clark, "initiating the sequence of events culminating in [her] firing." Compl. at ¶ 116. According to the Plaintiff, Defendant Clark lobbied for her termination and informed a third party, Dustin Hudak, that he would "have her [the Plaintiff's] ass." Id. at ¶ 121.

Defendant Clark maintains that his complaints to the Defendant Commissioners were privileged and therefore the Plaintiff cannot prevail on her claim for tortious interference. In the alternative, Defendant Clark asserts the Plaintiff "has pointed to no evidence in the record which shows that the Commissioners terminated her employment as a result of her actions on November 18, 2012, as reported to them by Steve Clark." Defs.' Reply at 36. The Defendant disagrees, and insists that she has presented evidence that Defendant Clark's complaints caused the Defendant Commissioners to terminate her employment.

"The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council, 651 N.E.2d 1283, 1294 (Ohio 1995). To recover on a claim for tortious interference with a

business relationship, a plaintiff must establish: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." <u>Ginn v. Stonecreek Dental Care</u>, — N.E.3d —, 2015 WL 1882536, at *3 (Ohio Ct. App. Apr. 27, 2015). "In contrast, the elements of tortious interference with contract are '(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.'" <u>Id.</u> (quoting <u>Fred Siegel Co., L.P.A. v. Arter & Hadden</u>, 707 N.E.2d 853, 858 (1999)). With respect to either claim, "the plaintiff must show that the interference was without justification or privilege." <u>Casciani v. Critchell</u>, No. C–140338, 2015 WL 1227849, at *6 (Ohio Ct. App. Mar. 18, 2015).

Although the parties' briefs concerning this issue leave something to be desired, under any formulation of a tortious interference claim, Defendant Clark is entitled to summary judgment. The Court assumes *arguendo* that Defendant Clark's comments were not privileged, but even with this assumption in place, the Plaintiff fails to demonstrate that Defendant Clark induced or otherwise purposely caused the Defendant Commissioners not to continue a business relationship with the Plaintiff, or not to perform a contract with the Plaintiff.

The Plaintiff specifically identifies as problematic Defendant Clark's statement to Dustin Hudak that "[the Plaintiff's] ass is in trouble and I'm going to push this as far as I can." To the extent the Plaintiff's brief can be read to argue that this statement constituted tortious interference, the Court disagrees. Defendant Clark made this statement to a third party, Hudak, a dispatcher at the 911 Center. Clark Dep. at 22. The record before the Court does not indicate that Hudak had any authority over the terms and conditions of the Plaintiff's employment. Further, there is no evidence that Hudak informed the Defendant Commissioners of Defendant Clark's

comment or that Defendant Clark's comment affected the Defendant Commissioners' decision to terminate the Plaintiff's employment.

The Plaintiff argues more generally that Defendant Clark's complaints to the Defendant Commissioners resulted in her termination. But, as previously explained, when construed in the light most favorable to the Plaintiff, the record demonstrates that the investigation that followed Defendant Clark's complaints was not the cause of the Plaintiff's termination. Rather, it was the Plaintiff's decision to discipline Bri Clark despite instruction from the Defendant Commissioners not to do so that resulted in the Plaintiff's termination. Defendant Clark's complaints did not cause the termination of the relationship between the parties, and, therefore, the Plaintiff's tortious interference claim fails. See McNett v. Worthington, No. 15–11–05, 2011 WL 4790759, at *5 (Ohio Ct. App. Oct. 11, 2011) (defendant entitled to summary judgment on the plaintiff's tortious interference with an employment relationship "because the evidence failed to demonstrate that [the defendant's] statements were the proximate cause of [the plaintiff's] termination of employment").

## IV.    Conclusion

For the foregoing reasons, the Court GRANTS the Defendants' Motion for Summary Judgment (doc. 43).

IT IS SO ORDERED.

S/ James L Graham
James L. Graham
UNITED STATES DISTRICT JUDGE

Date:   May 20, 2015